Lyell *v.* Hammond.

STATE OF TENNESSEE, for use, etc., of W. H. LYELL, *et als.*
*v.* J. C. P. HAMMOND, Ex'r, etc., of John Randolph,
deceased. *et als.*

1. **TRUSTEES.** *Duties of in investing funds.* In investing funds, a trustee
is held to perfect good faith, and the exercise of such reasonable care
in the execution of his trust, as would be given by a prudent man in
his business, and is responsible for any negligence creating loss, or for
want of good faith producing injury, and will be held to repair and
make good the loss or injury in case of failure to perform the duties
required of him according to this rule.

2. **SAME.** *Investment. Not a conversion when.* Where an executor, who
was charged with the investment of a fund in land to be held for the
sole use and benefit of the testator's widow, during her life, and at her
death to be sold and the proceeds to be distributed—one-half as the
widow might direct by will, and the other half to heirs of the testator's
sister—made a judicious and proper purchase of land, as he thought
and intended in execution of the will, but, innocently and ignorantly,
took the title in the name of the widow absolutely, not knowing that
the trusts expressed in the will should be recited in the deed; it was
*held*, that this did not amount to a conversion of the fund or a breach
of trust; and that as the land had not been aliened or encumbered,
the court would correct the deed so as to recite the trusts therein, and
that this was all the *cestui que trust* could fairly ask.

FROM SHELBY.

Appeal from the Second Chancery Court of Shelby
county.    S. P. WALKER, Ch.

L.B. McFARLAND and J. W. CLAPP for complainants.

L. W. FINLAY, W. M. RANDOLPH and T. B. MICOU
for defendants.

Lyell *v.* Hammond.

FREEMAN, J., delivered the opinion of the court.

John Randolph died in Shelby county in the latter part of the year 1859, having first made and published his will, by which he disposed of his estate, and appointing defendant Hammond, together with his wife Statira, now Mrs. Moore, to execute the same.

By said will he made the following provision, on which the present contest stands,—" Having sold my plantation in Shelby county, Tennessee, to Seaborn Sullivan for $12,320, payable as follows: one note due first of January, 1861, for $4,320; one for $4,000, due January, 1862; the third and last due January first, 1863, for like sum; now it is my will and desire, that my executor, hereafter named, shall re-invest the said notes or proceeds in a plantation for the use and benefit of my beloved wife, Statira Randolph, for her sole use and benefit during life, and at the death of my wife, it is my will and desire that the land shall be sold and one-half the proceeds shall go to the heirs of my sister, Sarah A. H. Lyell, now living in western Texas. The other half to be at the disposal of my beloved wife Statira.

It is further my will and desire that in the event my wife, Statira Randolph, should die without making a will disposing of her own property which I have bequeathed to her, that my whole estate, real and personal, shall be equally divided between the heirs of my sister, Sarah A. H. Lyell, and my niece, Statira Spratt."

This bill is filed in the name of the State of Tennessee, for the use of the children of Sarah A. H.

Lyell, by a next friend, was filed in 1871, Mrs. Randolph, then Mrs. Moore by intermarriage with defendant James Moore, being alive. Since this time, December, 1872, Mrs. Moore has died, and her husband, as her executor, represents her in this suit.

The suit is against Hammond and Mrs. Moore specifically as executors, and in that capacity, and their sureties on their bond as such. In fact it may be characterized in its leading features, as a suit on the bond, in a court of Chancery, against the executors and their sureties, for alleged breach of covenants of said bond; certain it is, that this is the general nature of the bill, from its statement of fact and form; whether it can be considered in any other aspect, we may inquire hereafter.

The character we have given the bill is evidenced, among other things perhaps, by the following consideration. First, it is filed in the name of the State of Tennessee, for the use of the beneficiary complainants under the will. It is so entitled, and in the commencement of the bill. This can only be on the idea that it is a suit on the bond given to the State, as this bond is. In addition, the sureties on this bond are defendants, and sought to be held liable on the obligations contained in said bond.

Another matter now before us is an independent bill was in Chancery, it is true, to which this aspect of the bill might have been more appropriately referable, to-wit, the gift of a sum of money to John Lyell, to be paid annually until he arrived at the age of twenty-one years. But on looking carefully into

the bill, it will be seen that it goes on precisely the same grounds, in reference to the matters now under discussion, as in reference to this bequest.

The sum of the charges of the bill is, after giving the clause of the will creating the trust, that the defendant accepted the trust, proved the will, gave bond, with the defendants named as sureties, and then, that on or about the 1st of March, 1860, had collected the full amount of the Sullivan notes, and to use the language of the bill, "but notwithstanding the express command of said will, their legal and moral obligation, their bond and duty, they have failed to comply with the terms of the will, by re-investing said fund of $12,320, or any part thereof, for the benefit of the beneficiaries, have appropriated it to their own use, been guilty of a conversion of said fund, and they and their sureties are liable for such breach of trust, for one-half of the same, with interest."

It is true, in one part of the bill, after charging the fund had been appropriated by Mrs. Randolph to her own individual use, it is added, "and if ever invested in anything tangible at all, it was so done as to be subject to her creditors, to be inherited by her heirs, disposed of as her caprice dictated, or otherwise lost by the mutations of her fortune."

This intimation is evidently based on a full knowledge of the facts, as to what had been really done with the fund, as will hereafter appear.

This specific prayer of the bill is for a decree against the executors and their sureties, with execution individually, in the name of the State, for the use,

etc., for the one-half of the fund, with interest from March, 1860, until paid into court. They have, however, added a prayer for removal of the trustees and appointment of new ones, with power to re-invest the fund in accordance with the directions of the will, and this in connection with a general prayer for other relief, will enable us to consider and decide the case on the questions discussed before us.

On the leading theory of the bill, simply a conversion of the fund and failure to invest, the life-tenant being alive, the parties not being entitled to the possession of this fund at all, it would have been clear, they would only have been entitled to such damages as they had sustained by reason of such failure to invest up to the time when suit was brought, a question on which it probably would have been difficult to show with certainty more than nominal damages, especially in the changed circumstances of the country, and shrinkage of value in land.

But treating the bill under the special prayer for removal of the trustees and re-investment of the fund when paid into court, according to the directions of the will, and in connection with the general prayer, as a bill to ascertain a trust fund, which had been wrongfully used by the trustees, and to enforce the performance of the trust, or have it executed under the direction of a court of equity, we proceed to dispose of the case as it stands in the record.

We can the more readily do this, as under the changed state of things, by the death of Mrs. Randolph, the time has arrived when the parties would be

Lyell v. Hammond.

entitled to the proceeds of the land purchased, if such had been the case. At any rate, their right to the bequest, and also to its possession in proper form is now complete.

The case, as clearly shown by the answer of the defendants, sustained by the proof, is simply and briefly this.

Mr. Randolph had sold his home, a desirable residence and fine farm, with a view of removing to a milder climate, and probably to seek a better cotton country entered somewhat into his views. He had consumption, and hoped to improve his health by a change. He was unable to carry out this purpose by the rapid advance of the disease. · After his death the widow did not wish to remove from the place where she had resided, and where she was comfortably situated. Hammond, the exector with her, it is proper to say, was a neighbor, an intimate and trusted friend of her husband, and was to have removed with him had his ·purpose been carried out; this he did not desire to do, after his death. A large number of negro slaves had been left the widow by her husband, together with all his property situated on the place sold to Sullivan. She and Hammond were charged with the re-investment of the Sullivan notes, the proceeds of his land, or rather it may fairly be inferred Hammond was so charged, as the testator studiously, it seems, uses the word "executor" in reference to this duty. It was to be done for the benefit of the wife, however, the home was for her, and to be for her sole and exclusive use during her life. In a word

having sold the home on which they had lived, he purposed supplying its place for the use of his wife. Certainly from these facts and the evident purpose of the testator in the re-investment in land, her wishes were to be controlling, and solely looked at.

The proof clearly shows, that in view of these facts, and the wish of the wife, the trade with Sullivan was agreed to be rescinded, or rather the land was re-purchased from him, but on terms of giving up his notes, and adding thereto a bonus of $2,500, which was paid by Mrs. Randolph, she borrowing the money from Hammond, and afterward repaying it. It is in form clearly a re-purchase of the land sold by the husband, for it seems he had only given a title bond, and a deed appears to have been first made by the executors to Sullivan, and then a conveyance by him to Mrs. Randolph on the same day—a significant fact. In this conveyance, however, the land is conveyed to her in fee, with no mention of the fact that it was fixed with the trust, or bought in pursuance of the directions of the will.

It is proven most positively, so far as the parties can prove it by swearing to it, and no witness proves a word to the contrary, that this purchase was made in fact in execution of the will, and was so intended, and was understood to be a re-investment of the Seaborn Sullivan notes. In fact, it is beyond dispute the notes were paid for the land, with the addition of the $2,500 advanced by Mrs. Randolph. But there are some circumstances that tend to militate against this, which it is proper to notice.

First, however, we should state, it appears clearly, that Hammond attended to and controlled the business part of the transaction. He says the deed was written according to his direction, or rather taken by him, he alone responsible for it, if wrong, and Mrs. Randolph knew nothing of its being wrong, he adds, if there is any error about it. She made and controlled the choice of the land to invest the fund in, and he did the balance. He swears most definitely the land was purchased as the best investment to be found, and at the earnest desire of the widow, and it clearly appears it was then worth the money paid for it. Nor does the contrary appear by proof, as to its value now, so far as this record shows. But, to the circumstances referred to.

It appears that when the transaction was completed, Hammond prepared, and Mrs. Randolph signed and gave to him a series of notes corresponding with the Sullivan notes, one of which we copy, as follows:

"$4,320. On or before the 1st day of January, 1861, I promise to pay to C. P. Hammond, executor, four thousand three hundred and twenty dollars, for a note on C. & W. Sullivan, belonging to the estate of John Randolph, which I borrowed of said Hammond, and used in the re-purchase of the land on which I now reside." Signed by her.

The other two notes are of like tenor, the dates simply changed and amounts, so as to correspond with the Sullivan notes.

On the face of the notes, it would appear these notes had been borrowed by Mrs. Randolph to pay for

the land, and her own notes put in their place. This is explained by Hammond as follows. He says: "I took the notes to guard the Lyell children, in the event she should marry. I supposed the notes were re-invested in accordance with the will, and asked her to execute them, and she did it. I can give no other reason why I did it, unless to protect myself. I consulted no lawyer about it, and supposed the re-investment was all done right, or I would not have done it."

In answer to a question on cross-examination, as to whether it was not in fact a loan to enable her to purchase the land, until such time as they could purchase other lands, he says: "It was not my purpose to re-purchase other lands. I considered that the investment. I consulted no lawyer about it, and thought it was done right. These notes were not loaned to her until such time."

In further explanation, after emphatically stating that he had no idea the matter had not been done in accord with the will, he says: "I took them for my protection, in case of her marriage, or wanting to sell the land, and for the protection of the Lyell children." He adds, "I had the deed made myself, without suggestion from any one—she had nothing to do with it." And alltogether, we can see nothing to lead us to doubt but that he really did not know that it was proper to show in the deed, that the land was to be held by Mrs. Randolph in pursuance of the will of her husband. He seems to have considered that the fact that it was so purchased, was all that was required. He so swears at least, and his depostion bears evidence of truthful-

ness in manner and tone—besides his character for integrity is emphatically endorsed by complainants in their bill  We are then compelled to assume his truthfulness until his statements are overturned.  There is no contra evidence, except the fact of taking the notes and the recital contained in them, the explanation of which are given, certainly showing no intentional or known wrong—at most, only a technical breach of trust or error, in ignorantly having a deed written without proper recitals, showing the true character of the transaction.  Assuming this to be the case in hand, then what are rights of the parties?

A trustee in a case like the present, is held to perfect good faith, and the exercise of such reasonable care in the execution of his trust, as would be given by a prudent man in his own business, and is responsible for negligence creating loss, or for want of good faith producing injury, and will be held to repair and make good the loss or injury, in case of failure to perform the duties required of him, according to the above rule.  In view of this rule, let us look at the facts of the case.

We assume there was no bad faith, and only a mistake of judgment or want of knowledge that it was proper to recite the trusts in the deed.  Then how does the matter stand?

The investment in the land was, beyond question, if really in execution of the trust, proper, and might well have been made.  In making this investment, the interest and wishes of the wife were the matters intended to be provided for—a home for her sole and

exclusive use for life was distinctly proposed. In this selection of that home he certainly intended she should be consulted, and she had the right to choose the place to be bought, and the executor was bound to have conformed to a reasonable and *bona fide* selection made by her.

In this the complainants had nothing to say, certainly not, unless it was clear that bad faith characterized the choice. The selection was eminently proper. She was settled on the place, had perhaps forty slaves, stock, utensils, and all proper necessaries incident to a well-ordered and well-stocked farm. It would not only have been inconvenient, but expensive to remove, and start at a new home. The investment then was proper, and was actually made in execution of the trust, and was one to which the complainants could not have objected, and of which they could not rightly complain. The land was valuable, well worth the money paid for it.

The only real matter of complaint is, that there is a technical breach of trust by the failure to recite the facts in the deed and have the trust declared or properly evidenced in the face of the conveyance. This error being an honest and innocent mistake of judgment, what is the remedy? Logically, and we think legally, to correct the error, and the only wrong done, is by having the trust declared, and complainants' rights properly protected, either by the voluntary action of the trustees, when their error was discovered, or by a decree of a court of chancery. When this is done, they have all they can fairly ask.

The argument of complainants, that this technical breach of trust is to make the trustee responsible for the whole fund, as for a conversion of it to their own use, is unsound in several respects. It assumes that the investment itself was a conversion, and wrong done them, and seeks to have the entire fund as money brought into court as if no investment had been made. This is a necessary element to sustain their conclusion. But, as we have seen, the investment itself was a proper execution of the trust, the failure to recite the trust in the deed the only wrong. In this view, it follows inevitably, the righting of the wrong is all they can properly claim. No injury has happened to them from this mistake of judgment. The land has not been sold or the title encumbered. The life tenant has continued to occupy it and use it precisely as she would have done had the recitals been in the deed. So that the fruit of the investment can be had now as well as if the trust had been properly evidenced. Mrs. Moore and her husband, it is proven, at once, when the matter was called to their attention, offered to correct the wrong and have the trust declared and put of record in any proper form the parties desired, even urged the parties to have such an instrument drawn, which was declined.

The trustees in their answer continue this offer, and ask that the court shall declare the trust and secure the rights of the complainants in this land in the amplest manner provided for by the will. But all this is declined. It is simply all they can righfully ask.

The argument drawn from the rule so familiar, cited

in the case of *Draper et als.* v. *Joiner,* 9 Hum., 614, that a trustee depositing money in a bank, or taking the security for it in his own name. will be held liable in the *event* of the failure of the bank, is not applicable to this case. The act done in that case is entirely wrong, identity of the trust fund is lost, and the ownership fixed in him; yet it is only said "he is liable in the event the bank fails." That is, if the fund is lost, it certainly could not be maintained that he ought to be subjected to the expense of litigation, if, notwithstanding this error, he had the entire fund intact, and when made aware of the error, offered at once to correct it. Certainly the fund remaining intact, and it being shown to the court, with an explanation such as we have in this record, that the failure to distinguish the trust fund, was the result of ignorant, but innocent mistake, the court would order the fund to be properly transferred to the credit of the trust, and so all the wrong would be righted.

That is precisely this case. The property in which the parties had an interest to have fixed with the trust, was the land in which the notes were invested, and because not so fixed, they sue. This in order that they might enforce a sale after the death of the life tenant, and receive the one-half the proceeds.

This property remains intact, as we have said, and a clear trust can be fixed upon it by a proper instrument or decree, as they were entitled to have in the lifetime of the widow. When they filed their bill, they had no right to control the investment itself. That was. for the executor and the widow, and they having

Lyell *v.* Hammond.

exercised their right, have to the extent of the investment fairly and faithfully executed the trust. The other step in which they erred, has produced no injury, no deprivation of right on the part of complainants. Their right is to sell the land fixed with the trust, in which the money was invested, on the death of the life tenant, and this they can now do, and thus get all that was given them by the testator's bounty. We might add to this argument, but do not deem it necessary. With the result of it we are satisfied, not only as to the law but the justice of the case, on the facts of the record.

If the case had proceeded to a decree under this view, before the death of the life tenant, all the parties would have asked, would have been a decree, ascertaining and settling their rights, as in a case of an inventory, ordered to perpetuate the evidence of the amount of a trust fund and a recital of the trust and a decree fixing it upon the land.

In the changed circumstances, the right is, after fixing the trust on the land, to have the same sold, the trust executed, and they have one-half its proceeds, as provided in the will.

The matter that has given us most difficulty is the $2,500, in addition to the trust fund, paid by Mrs. Randolph. We do not think this case can be held a breach of trust. In the nature of the thing to be done, and this must be considered, it was most improbable, if not impossible to have found a place that would have cost the precise sum of $12,320.

In view of the fact that it was the place held by

the husband as adapted in his lifetime to the profitable and proper use of the negroes he owned, and the wife was given all these, so that she took his place as to their management and use, it is certain there could have been no wrong in desiring the whole farm as left by her husband.

If this whole tract was unnecessary, or there was any impropriety or injury to the rights of complainants in its purchase, they should be required to show it, and how they have been injured by it, before they can complain of this matter.

If it had been only a few hundred dollars or some small sum, more or less, we would not have hesitated to say the land should be sold, and if it brought the full sum paid, each would receive his own; if less, the loss should be borne in proportion to the· money each had in it.

The amount does not change the principle, and so we hold this, the proper decree in this case, that if the land when sold brings less than the sum paid for it, the loss will be borne in proportion as the interest of the parties, measured by the rule stated.

We have no difficulty in assuming that the "heirs" mean children, in the connection as used in the will, and the estate vested in the children living at the death of the testator, subject to open to let in after born children of the sister.

This is a matter, however, between the parties interested in the fund, on which we need not definitely decree.

Decree will be drawn in accordance with this opin-

ion. Costs of the court below paid by the defendants Hammond and Moore; of this court, be divided equally between complainants and defendants Moore and Hammond. The costs of complainants will be paid out of the funds, as they are non-residents.