**MAYFIELD et al. v. FIRST NAT. BANK OF CHATTANOOGA, TENN.**

No. 9400.

Circuit Court of Appeals, Sixth Circuit.

Aug. 31, 1943.

Sam J. McAllester, of Chattanooga, Tenn. (Sam J. McAllester and Dawson Hall, both of Chattanooga, Tenn., on the brief), for appellants.

S. Bartow Strang, of Chattanooga, Tenn., for appellee.

Before HICKS, SIMONS, and ALLEN, Circuit Judges.

ALLEN, Circuit Judge.

This appeal attacks a judgment of the District Court dismissing petitions filed by certain intervenors in a class action instituted against the appellee bank on behalf of various mortgage certificate holders. The intervenors set up alleged breaches of trust, misrepresentations, and illegal investments, and prayed for the recovery of the full amount of the funds claimed by them to have been invested through the appellee.

There is no controversy as to the background of the case, which is as follows: On January 12, 1933, the appellee had issued and sold, and had outstanding certificates in the total amount of $10,300,000, which had been issued against mortgage notes of the same aggregate face value. On this date the appellee filed a petition in the state chancery court to liquidate its mortgage participation certificate pool, and for receivership. There were then approximately 1,800 certificate holders and 4,500 mortgages in the pool. Each certificate, issued for the term of three years and carrying interest at six per cent, stated in substance that the appellee had sold to the purchaser an interest of a specified amount in certain real estate mortgages which were set aside from the general assets of the bank; that the face value of the mortgage notes so set aside would at all times equal the face value of the certifi-

cates outstanding, and that each certificate should represent a proportionate interest in the mortgage notes so set aside. In the certificates the appellee reserved the right of substitution of other notes with like security, agreed to collect the interest and principal, and upon maturity to account to the certificate holder for the then value of a pro rata interest in the principal of the notes. For its services the appellee was to receive commissions in connection with the making or renewing of the notes and any interest above six per cent where such excess was lawful.

At the time of the receivership the certificates outstanding were in the main derived from the consolidation of mortgage pools operated by the Chattanooga Savings Bank and appellee prior to February 2, 1929, when the two banks were merged. Approximately thirty per cent of the certificates outstanding had been originally issued by appellee and seventy per cent by the Savings Bank.

In its banking business, the appellee made loans on real estate, the mortgage notes covering which were carried in its general assets, and not placed in the mortgage pool. Appellee kept its own notes and the notes assigned to the pool in separate files, but the pool mortgages were not ear-marked individually in any way. Transfers of mortgages from the pool file to the appellee's own file were constantly made, and vice versa. The amount of interest collected each day on pool mortgages did not correspond with the amount of certificate coupons maturing on that particular day. Accordingly the appellee deposited all interest collected upon pool mortgages in an account in which it commingled interest collected upon its own mortgages and from this account it paid interest upon the certificates.

At the close of the day's business, adjustments were made so as to keep the face value of the notes in the pool equal to the face value of the outstanding certificates. If the total of the pool mortgages was less than the total of the certificates, the appellee transferred to the pool file mortgages from its own file to make up the deficiency, and if the total of the mortgages in the pool file exceeded the total of the certificates left outstanding the appellee withdrew a corresponding number of mortgages from the pool file so that the totals were equal. As the transactions in the certificates were numerous and as no record

was kept of the shifting of mortgages from one file to another, it is impossible to determine when the mortgages which were in the pool at the time of the filing of the chancery case were placed there. Until some time after the collapse of the stock market in the fall of 1929 the mortgage pool was self-supporting, and the receipts from the payment of interest and principal of mortgages and from the sale' of new participation certificates were sufficient to pay the principal of the certificates when the holder declined to repurchase them. Later the receipts were not sufficient for this, and the appellee paid the interest and principal of the certificates from its own funds. This practice was continued up to the date of the filing of the bill in chancery.

A number of the properties which constituted security for mortgages in the Savings Bank pool were foreclosed in 1929, and in 1930 such foreclosures became increasingly frequent. In the foreclosures of 1930, 1931 and 1932 the property in every case was bought in by the First Securities Company, a wholly-owned subsidiary of appellee, which bid the amount of the defaulted interest and principal, delinquent taxes, trustee's commission, and other costs, and paid these amounts with notes which the appellee took for the property and placed in the pool. During the same years this company, which was operated by officers of appellee, bid in property in the amounts of $161,894.43, $302,117.93, and $1,032,000, respectively. In June and August, 1932, the appellee negotiated two loans with the Reconstruction Finance Corporation for $1,000,000 and $1,600,000, respectively. Live mortgages were drawn from the mortgage pool and given to the Reconstruction Finance Corporation as security, and the notes of the Securities Company were substituted in the pool.

All petitions filed in the case, whether alleging individual breaches of trust or special damages, or stating a class action for maladministration of the pool, were consolidated in the chancery case. The chancellor held the appellee not liable for losses caused by the depression, but liable to certificate holders as a class (1) for losses occasioned by loans made in excess of fifty per cent of the value of the security or where no appraisal was made, and (2) for losses resulting from wrongful substitution in the pool of the notes of the First Securities Company for a corresponding amount in mortgage notes. A decree was entered in conformity to the opinion, reserving, however, the right of any certificate holder to sue based on "any ground of liability not common to all."

The case was then removed to the District Court, where a compromise judgment was entered in favor of the certificate holders as a class. The court found that "The fair present value of the property finally recovered under the terms of the chancellor's decree is $500,000," and with the approval of the comptroller, the receiver and numerous parties, ordered that recovery be had against the appellee for $500,000 in full of all liability to certificate holders in general. The $500,000 was paid pro rata to all certificate holders including appellants herein. The intervening petitions of the appellants praying for special damages were dismissed by the District Court on the ground that the participation of these appellants in the recovery for damage to the pool securities constituted an election which precluded their further recovery.

Appellants contend that the District Court erred (1) in refusing to amend the pre-trial order and stipulation so as to broaden the scope of the hearing from one covering acts of mismanagement only to include acts alleged to constitute breach of trust and fraud and deceit, and (2) in holding that appellants' claims were barred by their sharing pro rata in the receipt of $500,000 paid by the appellee to all participation certificate holders in accordance with the compromise decree of May, 1934.

The pre-trial order entered upon agreement of counsel limited the issue of the appellee's liability to the question whether or not the appellee, at the time it issued or renewed the certificates, owed appellants the duty to disclose the condition of the mortgage pool. Under Rule 16 of the Rules of Civil Procedure, the pre-trial order "when entered controls the subsequent course of the action, unless modified at the trial to prevent manifest injustice." It is not necessary to decide whether the District Court should have granted the motion to amend the pre-trial order, for in practical effect it did grant it. Action on the motion was reserved until the hearing on the intervening petitions, and all testimony offered by appellants was received without limitation as fully as if the pre-trial order had been amended.

That it was given careful consideration is plain from the colloquy between the court and counsel. In spite of the limited scope of the pre-trial order, evidence was received showing that as to six of these appellants, appellee was the trustee of an express trust. Examiners' reports showed that at least from 1929 on a large number of the mortgages in the pool were for an amount in excess of fifty per cent of the value of the property, and that some of the loans were upon real estate located outside a radius of 100 miles of Chattanooga, in violation both of the federal banking act and of the statute of Tennessee with reference to investments by trustees and fiduciaries. Title 12 U.S.C. § 371, 12 U.S.C.A. § 371; Williams' Tennessee Code, § 9596.1.

It also appeared that the appellee renewed numerous certificates after the real estate had depreciated to less than double the face value of the mortgage; that the mortgages of the Savings Bank pool, which constituted some seventy per cent of the entire assets, were upon less valuable property than those of the appellee's pool, and that appellee's officers after the merger, including W. H. Ford, who was trust officer, were the former officers of the Savings Bank. These officers not only failed to notify the appellants of any impairment of the mortgage security, but in at least one case insisted, against the wishes of the representative of the cestui que trust, that funds invested in other securities be invested in participation certificates. It was shown that certain property inherited by Mrs. Alice Head Nixon from her husband, consisting of valuable stocks and bonds in the control and custody of the appellee as co-executor, was sold and the proceeds converted into participation certificates without the knowledge of Mrs. Nixon. In several instances it appeared that investments in participation certificates were made upon the positive representation of the Savings Bank and its trust officer that the certificates were as good as Government bonds and that the face value of the notes was less than fifty per cent of the value of the property that they covered. Substantial evidence was adduced to the effect that these representations were the inducing cause of the purchase.

This testimony has been detailed because appellants rely upon it for their major propositions. It was heard and considered by the District Court with reference to the breaches of trust alleged, and hence no claim of reversible error can be based upon the fact that the District Court formally denied the motion to broaden the scope of the pre-trial order.

Appellants' principal contentions are that their petitions set forth individual torts and breaches of trust and constitute causes of action not common to all; that the appellants are not barred by the receipt of the participating dividend from further pursuing their remedy for breach of trust, and that they are entitled to be made whole for the peculiar individual losses which they have sustained, as they would neither have bought nor retained the participation certificates held by the various trusts if the Savings Bank and the appellee had not been guilty of breach of trust. They ask for judgment with interest for the money originally invested, and for equitable relief.

The appellee concedes that various express or testamentary trusts constituted the Savings Bank trustee for six of the appellants, but claims that the participation certificates, which made up the major part of the various trust estates, were purchased by the settlors of the trusts and by them turned over to the Savings Bank, and that hence the appellee is not liable for wrongful investments. As to the eight appellants, an express active trust with the Savings Bank as trustee existed in the Mayfield, R. G. Sharp, Elizabeth Sharp, Mary A. Johnson, Nixon and Howell cases. The last two trusts were testamentary. It clearly appears that the certificates owned by Inez Hyder and Marjorie Hyder were bought by Inez Hyder individually from 1926 on, deposited with the Savings Bank, and later left in the possession of the appellee, no trust agreement existing, and we do not further consider the cases of these appellants, as they fall within the class of ordinary purchasers. The property covered by the Mayfield trust agreement was $5,000 of participation certificates which Mayfield in 1923 expressly authorized the Savings Bank to buy. R. G. Sharp, in 1922, purchased certificates in the amount of $20,000, in which the R. G. Sharp trust fund was established with the Savings Bank as trustee in 1926. W. A. Sharp turned over to the Savings Bank in 1926 $20,850, which was invested in certificates by the Savings Bank. As co-executor of the estate of W. J. Nixon, deceased, the

Savings Bank in 1925 sold standard stocks and bonds and invested $200,000 in participation certificates without consultation with Mrs. Nixon, widow of the testator. Mrs. Mary A. Johnson, in 1924, turned over $9,000 in certificates of deposit and $500 cash to the Savings Bank to invest for her under a trust agreement. The Savings Bank immediately converted this fund into participation certificates. In the last three cases at least the Savings Bank actively made the investment.

As to all of these appellants, whether they themselves as settlors, or the Savings Bank, invested in the certificates, the trustee had more than the duty of mere faithful retention of the certificates. While a distinction should be observed between the acts of trustees in making investments and their acts in making or failing to make prompt disposition of securities received from the settlor of the trust (Cf. In re Fulton Trust Co. of New York, 257 N.Y. 132, 177 N.E. 397, 77 A.L.R. 499), the utmost good faith was required of the trustee both in investment and reinvestment. The certificates were subject to periodical renewals and each renewal was an investment. On every such occasion the trustee was bound with single-minded integrity to care for the interests of its cestui que trust. Cf. U.S. National Bank & Trust Co. v. Sullivan, 7 Cir., 69 F.2d 412.

The purchases of certificates by the settlors claimed to have been induced by fraudulent representations occurred long before the decline in real estate values. The purchase by R. G. Sharp was in 1922, by W. A. Sharp in 1926, by the Savings Bank for Charles S. Mayfield in 1923, by the Savings Bank for Mrs. Johnson in 1924. The unauthorized purchase of $200,000 worth of certificates for the Nixon estate occurred in 1925. But the renewals of these certificates continued through 1929, 1930, 1931, and 1932, and were effected by the appellee.

The appellee knew of the various reports of bank examiners from 1929 to 1932 as to the rapidly increasing amount of past due mortgage loans, the numerous loans secured by real estate on which no appraisal had been filed for many years, and the many loans made on valuations which the examiners reported may have been "greatly inflated." In March, 1932, the examiners stated as to these loans that "The bank has already resorted to the subterfuge of deeding the properties to the affiliate First Securities Company in turn accepting their notes for a like amount purporting to be secured by the properties in question." Many loans had been carried five, ten, or fifteen years without reduction. There was a list of loans to officers, directors, employees, and enterprises held against participation certificates totaling $732,601. The appellee's officers knew in 1929 that many securities in the combined pool had not been appraised as required by the federal banking act; that loans in excess of fifty per cent of the value of the securities had been made; that some of the securities had not been appraised at all; that many so-called appraisals were in fact mere inspections; that the securities had greatly depreciated in value, and that the loans had not been made in compliance with the provisions of federal or state law. The appellee renewed participation certificates during the period from 1929 to 1932 or 1933; consequently it cannot absolve itself of responsibility on the ground that it did not make the original investment.

The appellee had the legal title to the mortgages, holding them in trust for the certificate holders as security for payment of the certificates. It had all the certificates in its possession, together with the papers referring thereto. It alone could be acquainted with the complete facts as to the worth of the securities, as to payments of interest, principal and taxes, upkeep of insurance, and other pertinent details. Whether or not the certificates were purchased by settlors of express trusts or by the Savings Bank, since they were renewed by the appellee it owed the duty of imparting to the cestuis que trustent the knowledge it had as to the value of the underlying security. This is particularly true when a bank, as here, combines with its usual business the business of negotiating securities issued by itself from which it derives a lucrative income through commissions and through the use of the large funds paid in by the certificate holders. The dual position which is always hazardous to a trustee [Booth v. Greer Investment Co., D.C., 52 F.2d 857, affirmed 10 Cir., 62 F.2d 321], inevitably results, and the bank subjects itself to possible liability, either for breach of trust, fraud or deceit, or mismanagement of the investment.

The trust agreements were made in Tennessee, and are governed by Ten-

nessee law, which follows the general rule that it is the paramount duty of the trustee to exercise the utmost good faith and to administer its trust with diligence, prudence and care. Coffee v. Ruffin, 4 Cold. 487, 44 Tenn. 487; State v. Hammond, 2 Lea 378, 70 Tenn. 378. A trustee is not permitted to use the trust funds or property for his personal profit, nor to acquire any interest adverse to that of the cestui que trust. Cannon v. Apperson, 14 Lea 553, 82 Tenn. 553, 585. The broader the latitude of discretion given to the trustee, the greater is the duty of good faith required in the exercise thereof. Coffee v. Ruffin, supra. Here appellee's interest was adverse to that of the beneficiaries because the fact that the appellee would receive a commission if the certificate was renewed tended to influence the appellee to renew the certificate without giving due regard to the conditions in the real estate market and in the pool itself, described above.

Appellee also contends that the appellants' actions are barred by the statute of limitations; that the misconduct set forth by the appellants, if any, was that of the Savings Bank for which appellee is not liable, and that the receipt of the participating dividend constituted a binding election barring the present action.

■ The point that the statute of limitations has run against these claims has no support in law. The statute of limitations does not run in favor of a trustee against a beneficiary until the trust matures and accounting and settlement are made, or until a sufficient time has elapsed for execution of the trust and settlement. Hamby v. Reid, 101 Tenn. 438, 47 S.W. 692; Williams' Tennessee Code (1934), § 8600. Accounting and settlement occurred in 1933 after the appellee became insolvent and receivership was instituted, and all of appellants' suits were timely brought within six years after that date.

■ Nor is appellee absolved from liability because the express trusts were all established with the Savings Bank as trustee, prior to the merger of 1929. Title 12 U.S.C. § 34a, 12 U.S.C.A. § 34a, provides that when a state bank is consolidated with a national banking association "no such consolidation shall be in contravention of the law of the state" under which the consolidated bank is incorporated. Williams' Tennessee Code, §§ 3751 and 3886, read together, provide that the consolidated bank shall take over the assets of the constituent banks and become liable for all their "debts, liabilities and duties." Liability is a broad legal term which is usually held to include every kind of legal obligation, responsibility or duty, certainly all that are measured by money obligation. Liability may arise from contract, express or implied, from duty imposed by law, or by judgment of a court, or as a consequence of tort committed. Assuming, but not deciding, that the Savings Bank committed a tort or a breach of trust in investing in the certificates during the period from 1922 to 1926, clearly the appellee, under the above statutes, would be liable for the wrongdoing of the Savings Bank prior to the merger. In any case it is liable for its own wrongful reinvestments of trust funds.

■ However, we think that the judgment of the District Court must be affirmed on the ground that the appellants are barred from further recovery under the doctrine of election. The District Court held that "Sales of certificates effected by false representations, express or implied, or in cases where a fiduciary relationship existed between buyer and seller, may be assumed to have created the basis for one or two actions. The buyer, upon discovery of the fraud, could rescind the contract, restore to the seller any benefits he had derived prior to the discovery of the fraud, and collect in a suitable action the whole of the consideration. None of the Class A petitioners whose petitions are now before me pursued that remedy. Each has affirmed the contract of purchase and seeks to recover damages on the basis of difference in value of the certificate when acquired and what it would have been worth had it been as represented."

■ The court concluded that an investor who complains of an unauthorized investment of his fund must ratify the unauthorized act and abide the result or must disaffirm when he knows the act occurred. "He cannot pursue two remedies."

■ Appellants contend that the court erred in holding that when they received the participating dividend and subsequently prosecuted their actions for additional damages on the ground of breach of trust, they assumed the inconsistent positions on which the doctrine of election is based. They rely on Continuous Zinc Furnace Co. v. American Smelting & Refining Co., 2 Cir., 61 F.2d 958, and France & Canada Steamship Corp. v. Berwind-White Co., 229 N.Y. 89, 127 N.E. 893, 10 A.L.R. 752,

and other cases, as supporting the proposition that the claims presented in the class action, while not identical with the appellants' claims for breach of trust, are not antagonistic, and may be prosecuted concurrently. The Continuous Zinc Furnace Co. case involved a cause of action for fraud in inducing the contract and a cause of action for breach of contract, and the court held that these actions were not inconsistent. We think that this decision, and those on which it relies, are not in point here on the facts, and hence are not controlling. What each appellant in effect demands here is the right to recover the entire trust fund. This necessarily involves a repudiation of the trust contract. But the only theory on which appellants were entitled to receive the participating dividend was that the contract was in existence and that the purchase of the certificates was ratified and affirmed. Therefore the District Court correctly decided that the appellants were barred by the doctrine of election.

We bear in mind that the Supreme Court in Friederichsen v. Renard, 247 U.S. 207, 38 S.Ct. 450, 62 L.Ed. 1075, has characterized the doctrine of election as a "harsh" rule. We have less hesitation in applying it here because of the peculiar circumstances governing these individual cases and precluding recovery. In each instance when the original purchase of the certificates was made the certificates appear to have been worth their full face value; that is, in the years from 1922 to 1926. In the Howell case the petition states that the certificates "had a market value of par and could always be disposed of for par." For a number of years the appellants or their representatives received the dividends and the benefits of the investment without the slightest question. S. Withers Howell was co-executor with the Savings Bank of the estate of whose depletion he complains. While he mildly protested against the reconversion of Liberty bonds in 1930 into participation certificates, he cannot assert any right based upon the wrongdoing of his co-executor whose legal power and obligation was no greater than his own. The rapid advance of the real estate depression must have been known to all the appellants and was notice of the hazard to their investment and its underlying security. While Mrs. Mary A. Johnson, at the time the Johnson trust was established, was aged and infirm, her son, who is sole beneficiary of her will and appellant here, cared for her business interests and actively planned for the trust agreement. From 1924 to 1933 he failed even to acquaint himself with the nature of the investment, and he cannot equitably demand restitution of the trust fund. Cf. Woodfolk v. Marley, 98 Tenn. 467; Wright v. Johnson, 149 Tenn. 647.

As to the cases where the trust was specifically established in the participation certificates (Howell, R. G. Sharp, Elizabeth Sharp, and Mayfield), under Tennessee law the trustee was not authorized to change the investment except on a showing of manifest benefit. Morris v. Richardson, 11 Humph. 389, 30 Tenn. 389, 394; Singleton v. Love, 1 Head 357, 38 Tenn. 357. To change an investment not unsound when originally made to one of "manifest benefit" in 1930, 1931, or 1932, would have been highly difficult, if not impossible. In the Elizabeth Sharp and Howell cases the appellee was discharged in the settlement in the county court, and these settlements cannot be impeached except upon a bill specially filed to surcharge and falsify the account. Fitzsimmons v. Johnson, 90 Tenn. 416, 17 S. W. 100; State v. Abernathy, 159 Tenn. 175, 17 S.W.2d 17. Under the Mayfield trust agreement the appellee was required to purchase certificates with the income as it accumulated. The trust agreement was revocable at the option of the appellant Mayfield, but until revoked, the appellee was bound by its terms. In the Elizabeth Sharp case the Savings Bank was not authorized to sell the certificates. These circumstances as to the trusts named preclude the relief sought.

Finally, in receiving the participating dividend, which was an equitable approximation of the damages for mismanagement of the pool, appellants were made whole for the damage really suffered in consequence of appellee's wrongdoing. To adjudge them more would be to give them more than one recovery for one wrong. Cf. Continuous Zinc Furnace Co. v. American Smelting & Refining Co., supra, 61 F.2d at page 959.

The judgment is affirmed.