**CONTINENTAL GRAIN COMPANY,**
**Plaintiff,**

v.

**The FIRST NATIONAL BANK OF MEM-PHIS and Charles G. Black, Trustee in Bankruptcy for Butler-Foster Milling Company, Defendants.**

**Civ. No. 2860.**

United States District Court
W. D. Tennessee, W. D.

May 8, 1958.

Canada, Russel & Turner, J. Martin Regan, Memphis, Tenn., Charles Gutwirth, Theodore Ness, New York City, for plaintiff.

Shepherd, Heiskell, Williams, Beale & Wall, Memphis, Tenn., for defendant Bank.

James Sedden Allen, Walter Armstrong, Jr., John R. Gilliland, Memphis, Tenn., for trustee.

BOYD, District Judge.

The plaintiff, Continental Grain Company, hereinafter referred to as Continental, a Delaware Corporation, on March 16, 1956, filed this suit against the First National Bank of Memphis, hereinafter referred to as The Bank, a Corporation organized under the National Banking Act, 12 U.S.C.A. § 1 et seq., and Charles G. Black, Trustee in Bankruptcy for the Butler-Foster Milling Company. Plaintiff asks the Court to declare a recision of a soybean trade between the plaintiff and the Butler-Foster Milling Company, hereinafter referred to as Milling Company. This trade was made on February 28, 1955, and concluded on March 1, 1955, prior to the time that the Milling Company was adjudicated a Bankrupt.

The complaint further asks the Court to declare that the money which Continental paid on March 1, 1955, to the Milling Company, pursuant to this trade, was held by the Milling Company as constructive trustee for the use and benefit of Continental on the theory that Continental was induced by Milling Company's fraud to pay the money. In addition, the plaintiff asks that the defendant Bank also be declared a constructive trustee for the use and benefit of Continental as to that portion of the money used by the Milling Company to discharge its indebtedness to the Bank.

It is admitted by all parties that the Milling Company was guilty of fraud in obtaining the sum of $3,164,458.05 on March 1, 1955, from Continental as the purchase price of 1,299,839 bushels of soybeans.

The Bank, in its answer, asserts that the payment made to it by the Milling Company on March 1, 1955, in satisfaction of its debt, was received by the Bank in the regular course of business and that the Bank did not know or suspect, or have reason to know or suspect, that the Milling Company had obtained the money by fraud or any other improper means, and that it, therefore, received the money as a bona fide purchaser for value, without notice, free from any equities which Continental might have in said funds; that the Bank, in the belief that its debt had been paid in full, materially altered its position by releasing excess collateral on other loans and other security interests held by it up to this time. The Bank further answering states that, wholly aside from other defenses, as a result of this change in its position between the receipt of payment on March 1, 1955, and the filing of this suit on March 16, 1956, that it would be unfair and inequitable to impress a constructive trust upon it at this time; that the equities of the Bank are superior to those of Continental; and that if the Trustee's position to the effect that the plaintiff has waived or elected not to pursue its right of recision is sustained, the plaintiff's suit must, as a matter of course, be dismissed as to the Bank, since Continental's claim against the Bank is dependent upon its sustaining its right to rescind.

The defendant, Charles G. Black, Trustee in Bankruptcy, in his answer alleges that the plaintiff, as a result of actions taken by it subsequent to the time Continental learned of the fraud, has waived its right and elected not to rescind and, therefore, is precluded from rescinding the contract of the sale of

soybeans at this time. The Trustee further alleges that the Bank, in receiving payment of the Milling Company's indebtedness on March 1, 1955, acted in absolute good faith and gave value and, therefore, was a bona fide purchaser for value and took the money free from any claims of Continental.

The Trustee filed a counter-claim against Continental asking the Court to declare that the Milling Company is not a constructive trustee and that the only rights which the plaintiff has against the Trustee in Bankruptcy are those of a common creditor.

In addition, the Trustee filed a cross-claim against the Bank alleging that the payment which the Milling Company made to the Bank on March 1, 1955, constituted a preferential transfer under Section 60, sub. b of the Bankruptcy Act, 11 U.S.C.A. § 96, sub. b. Inasmuch as the Trustee's preference suit necessitated a trial by jury, the Court has ordered that same be heard separate and subsequent to the other aspects of this case. The preference claim, therefore, is not before the Court at this time.

The Court, upon the pleadings, proof, stipulations of the parties, briefs and arguments of counsel, makes the following:

## Findings of Fact

1. In view of the magnitude, importance and scope of the issues presented in this case and the voluminous record of several thousand pages of testimony heard in a month long trial, it is considered necessary that a somewhat detailed recitation of the background and facts of the case be made. Every facet of this case involves the actions and activities of Landon V. Butler and his relationship with one or more of the principals in this lawsuit.

2. Butler was, for sometime prior to mid-March, 1955, a highly respected businessman of substantial means. He was the President and dominant officer of the Butler-Foster Milling Company, the Black Gin Company and Butler-Foster Farms, all Missouri corporations, and the Alabama Grain Elevator Company, Inc., an Alabama corporation. In addition, he was a one-third partner in the brokerage firm of F. M. Crump & Company, and held a one-third interest in the F. M. Crump & Company, Corporation, both of which were large and successful firms in Memphis, Tennessee, carrying on extensive cotton buying and selling activities.

3. The Alabama Grain Elevator Company, Inc., hereinafter referred to as Elevator Company, owned and operated a large grain elevator at the Port of Mobile, Alabama. It was duly licensed public elevator subject to control, supervision and inspection by the authorities of the State of Alabama.

4. The three Missouri corporations above referred to owned and operated extensive farm lands in southeast Missouri. These companies also owned and operated cotton gins, alfalfa dehydrating plants, milling plants and a number of grain elevators located in southeast Missouri and southern Illinois. These elevators were often referred to as "country stations", and were all located in a large soybean producing area. For a number of years Butler had acquired in the southeast Missouri and southern Illinois area large quantities of these beans which were stored in his country stations and thereafter transported to Mobile and other locations where they were sold. Butler also for a number of years had been acquiring large and substantial quantities of "spot" or "cash" beans in the Chicago area and other parts of the country. It was known by many that he had used the soybean futures market extensively for the purpose of acquiring "spot" or "cash" grains. He would do this by going long on the soybean futures market, retaining his long positions until the delivery date and then calling for the delivery of the beans. He was also known from time to time to have taken substantial positions on the futures markets not only on soybeans but on other commodities such as coffee and cocoa, these

positions often being of a speculative nature.

In all of these activities, Butler had been very successful and was regarded as a highly informed, able, capable and thoroughly honest operator in all of these fields and his wealth seemed to be continuously increasing.

5. Individually, and as a principal officer in the various companies with which he was associated, Butler, over the years, had engaged in numerous large transactions with a wide variety of companies and people, such as cotton mills, cotton gins, farmers, grain companies, warehouses, futures brokers, banks and others. He was highly regarded by all of those with whom he dealt and his reputation for integrity and business ability was of the highest. In addition, he and his various companies, for a number of years, had been large borrowers from banks not only from the three large Banks in Memphis but from banks in other parts of the country. Borrowing from various banks were often in excess of one million dollars per bank. Large though his borrowings were, the total liability of Butler and his companies to banks so far as has been shown by this record never exceeded a ratio to his working capital in excess of two to one, although it is customary in banking circles for a person engaged in this type of business to borrow from six to seven and, sometimes, as much as ten times his working capital.

6. The loans of Butler and his various companies were always well margined and handled in a thoroughly satisfactory manner insofar as the banks with which he dealt were concerned. Butler was much sought after as a bank customer.

7. The experience of the defendant Bank with Butler began in about 1939, before he accumulated his fortune. His borrowings between 1939 and 1942 from the defendant Bank, though never very large, were always handled in a thoroughly proper and businesslike manner. In 1952, Butler, individually, the F. M. Crump & Company partnership, the F.

M. Crump & Company corporation and the Butler-Foster Milling Company all became borrowing customers of the Bank, though some of them continued to be substantial customers of other Banks in Memphis and elsewhere. The experience of the Bank with Butler and the various companies referred to above was extremely good. A line of credit in soybeans was extended in October 1952 by the Bank to the Milling Company in the amount of $750,000.00. Increases were made from time to time in this line of credit between October 1952 and May 1954, at which later date the line reached three million dollars where it remained until Butler's financial collapse in mid-March 1955. This line of credit was secured by the pledge of warehouse receipts covering soybeans, wheat and other commodities and the continuing personal unconditional guaranty of Butler for the entire indebtedness. At the outset a twenty percent margin was required because of the speculative nature of Butler's activities and subsequently this margin was increased to twenty-five percent. The Milling Company always maintained more than adequate margin and it was never necessary for the Bank to make a margin call.

8. Throughout the life of this line of credit the Bank received from the Milling Company numerous warehouse receipts, some from the St. Louis Terminal Warehouse Company operated in the country stations of Butler's companies in Missouri, some from the Alabama Grain Elevator Company, some from other warehouses and sometimes bills of lading. From time to time, as the indebtedness would be reduced, the receipts held as collateral by the Bank were released. These receipts moved freely in the channels of commerce.

9. It is customary in dealing with warehouse receipts to accept them at their face value without the necessity of either banks or businessmen checking the issuing warehouses. Mr. Butler had been doing business with Continental since 1949 and was known to the top executives of that company, all of whom

had a high opinion of his integrity, business ability and financial strength. Butler often purchased and held large quantities of "cash" soybeans which, from time to time, he sold to Continental and other Grain companies. He was, in fact, as was noted by one of the top executives of Continental, one of the sources from which Continental acquired annually several million bushels of soybeans.

10. In the fall of 1954, Butler, in one transaction, sold some 4,000,000 bushels of soybeans for approximately $10,000,-000.00 to the plaintiff. This and all other transactions between Butler and Continental prior to February 28, 1955, were handled in a completely satisfactory manner.

11. In a general way this reflects the situation of the parties herein when the actual events which finally culminated in this suit began to unfold.

12. On February 14, 1955, the Bank learned from a Dow-Jones ticker tape release that the Commodity Exchange Authority of the United States Department of Agriculture had filed charges against Butler alleging violations of certain provisions of the Commodity Exchange Act, 7 U.S.C.A. § 1 et seq. These charges alleged that Butler and a number of his associates in the spring and summer of 1954 had attempted to corner the Chicago soybean Futures market; that he and his associates had held large percentages of the deliverable stocks of soybeans during most of 1954 and withheld them from the market for the purpose of affecting the price of futures, and that as a part of Butler's effort to manipulate prices he had given false information to members of the grain trade which was designed to picture shortages of soybeans available for delivery.

13. About the time the charges became public, Butler phoned W. A. Wooten, head of the Cotton Department of the First National Bank of Memphis, and told him that the charges had been filed, that he was not guilty of the charges, as he had done nothing in violation of the rules, and that he had previously had similar charges filed against him by the Chicago Board of Trade and that the Board of Trade had exonerated him. He stated that even if he should be found guilty, the most that could happen to him would be that he would be suspended from trading on the futures markets for a few weeks.

14. Mr. Wooten, a man with a great many years of experience in the commodities field, both as a banker and as a former cotton merchant, did not consider that the charges were serious insofar as having any adverse effect upon Butler's credit. However, the officials of the Bank made a routine check on Butler's overall bank positions and informed other banks known to be doing business with Butler of the charges and determined what their reactions to the charges were.

15. One of the Bank officers on February 14, 1955, called W. B. Saunders in the Chicago office of Cargill, Inc., a large grain trading firm, and a member of the Chicago Board of Trade, to get his feeling about these charges. Mr. Saunders reported that he did not take the charges seriously, that Butler had had similar charges placed against him by the Chicago Board of Trade and had been cleared and that the worst that would happen to Butler if he were found guilty would be that he would be suspended from trading for a short time. John C. Whitsitt, another bank officer, also called one of the large New York brokerage houses to get its views relating to the charges and received no adverse information.

16. On the same date the Bank officials contacted two other Memphis banks and wrote letters to the Merchants National Bank at Mobile, the First National Bank of Mobile and the Bank of Manhattan, New York City, with whom it knew Butler had done business in the past. They informed those Banks of the charges and inquired as to the feeling which each Bank had concerning the charges and of their present positions with Butler.

17. The next day, February 15, 1955, officers of the Bank phoned Ward Faulk,

Senior Vice-President of Merchants National Bank of Mobile, and Robert Bacon, executive Vice-President of the First National Bank of Mobile, and discussed with each the Commodity Exchange Authority charges and Butler's overall borrowings. From these conversations, which were subsequently confirmed by letters from each of the said banks, the defendant Bank learned that Butler individually owed Merchants National Bank of Mobile $396,000.00, secured by warehouse receipts calling for 198,000 bushels of soybeans stored in the Alabama Grain Elevator Company and that Alabama Grain Elevator Company owed The First National Bank of Mobile approximately $949,000.00, secured by 450,000 bushels of soybeans evidenced by warehouse receipts of the St. Louis Terminal Warehouse Company.

18. In a phone call received from the Bank of Manhattan John Whitsitt, of the defendant Bank, on February 16, 1955, learned that Butler had an open and unused line of credit for borrowing on soybeans up to $2,000,000.00, and that at the time Butler, under another line of credit, owed the Bank of Manhattan approximately $541,000.00, secured by cocoa and listed stocks. The Bank of Manhattan also reported that F. M. Crump and Company at that time owed the Bank of Manhattan $1,100,000.00, which debt was secured by cotton and well-margined.

19. Each of the three banks referred to above, as well as the two Memphis Banks, expressed the greatest confidence in Butler's integrity and financial strength, and each of the said banks indicated that they intended to continue their present lines of credit without any change.

20. When Ward Faulk, of the Merchants Bank of Mobile, learned of the amount of receipts held by the defendant Bank he was at first somewhat disturbed over the number of receipts outstanding in excess of the 1,600,000 bushel rated capacity of the elevator proper, but advised the Memphis Bank that he understood that the elevator might, from time to time, have issued receipts against commodities stored in railroad cars and barges, and a few days later in his reply to the Bank's letter, stated that he did not feel that the Bank loans were jeopardized as a result of the matter which had arisen, that his bank intended to continue to go along with Butler, and that there was no question in the minds of the Mobile bank officers as to Butler's integrity, ability and financial strength. He further stated he had every reason to believe that Butler in his dealings had always been entirely open and above board.

21. About the time the letters were being written on February 14, 1955, to the various banks, John Whitsitt, one of the Bank officers, recalled from an earlier conversation with Wheatley Davis, Regional Manager of the St. Louis Terminal Warehouse Company, that his company had a field warehouse in Mobile. This Bank officer further recalled that he had somewhere in the past seen something indicating that the rated capacity of the elevator proper was 1,600,000 bushels. He thereupon called Wheatley Davis and inquired if St. Louis Terminal was using any part of the Alabama Grain Elevator Company for its field warehouse and, if so, the amount of space occupied by it. He also inquired of Wheatley Davis as to the capacity of the Alabama Grain Elevator.

22. Wheatley Davis stated that they did have a field warehouse at the Alabama Grain Elevator Company, but that all of the records relating to the capacity of the Elevator and the number of receipts which they had outstanding, as well as the portion of the Elevator leased by it, were in the main office at St. Louis. He stated that since he did not have the information he would call his St. Louis office and would inform the defendant Bank later. In this conversation, Mr. Davis stated that he understood that the Elevator did have additional storage facilities outside of the Elevator and had in the past issued receipts on commodities in its control but stored on railroad cars, barges, and on leased property.

23. On February 17, 1955, Henry Bugg, Vice-President of St. Louis Terminal, called Allen Morgan, Executive Vice-President of defendant Bank, and stated that Wheatley Davis had reported the Bank's call to him, and asked if the Bank could advise St. Louis Terminal of the total number of warehouse receipts outstanding. In this conversation, he also stated that St. Louis terminal had sent some of its men to Mobile for the purpose of checking the Elevator and that he would give the Bank a report as soon as he heard from them. As the figures to total receipts outstanding were in the Cotton Department, Mr. Morgan promised to get the information and to call Mr. Bugg back.

The following morning, February 18, 1955, Allen Morgan and John Whitsitt of the Cotton Department, returned the call of Mr. Bugg, but in his absence talked to A. J. Bardol, Vice-President and Secretary of the St. Louis Terminal Company, who was familiar with the matter. The Bank officers advised St. Louis Terminal of the total number of receipts known to the Bank to be outstanding at that time, these figures being 1,517,000 bushels held by The First National Bank of Memphis, 450,000 bushels held by The First National of Mobile, and 198,000 bushels held by Merchants National of Mobile. Mr. Bardol advised the Bank that the number of receipts held by The First National of Mobile was 452,000 bushels. He then stated that his men had been sent to look into the situation at the Elevator, as St. Louis Terminal was concerned over the storage space as against the number of receipts outstanding.

24. While Mr. Bardol stated that he did not have a final report from their men, as they had not returned from Mobile, he had received certain information from them over the phone. He stated that while the investigation revealed that there was not sufficient space in the Elevator itself to cover the receipts outstanding, there were apparently sufficient beans on hand to cover the outstanding receipts, if grain on barges and rail cars were included. He stated that the reason for the apparent discrepancies between receipts outstanding and the capacity of the Elevator itself was the fact that the Elevator, in keeping with a practice in the Port of Mobile, had been issuing receipts against commodities in railroad cars and barges. Mr. Bardol seemed to be satisfied about the number of receipts outstanding in relation to the capacity of the elevator tanks themselves.

25. Mr. Bardol further explained that Butler was in Mobile while the inspection was made and that his men had requested him to make available to St. Louis Terminal his complete records at the warehouse so that St. Louis Terminal could check them from time to time and thus have assurance that there was on hand sufficient grain to cover all outstanding receipts. Butler was unwilling to meet these terms and informed the Terminal Company that within two to three weeks he would have a boat arriving and would load into it beans covered by St. Louis Terminal receipts, enabling it to be released from the picture.

In this conversation, Mr. Bardol indicated the desire of St. Louis Terminal Company to expand its field warehousing operation at the Elevator to cover the entire elevator, and requested the Bank's cooperation and assistance in getting Butler to agree to this.

26. On February 18, 1955, the Milling Company paid the Bank $300,000.00 on its indebtedness and withdrew from the Bank warehouse receipts covering 150,000 bushels of grain, informing the Bank at the time that the grain thus withdrawn was a part of an export sale which Butler had made.

27. On the morning of February 19, 1955, Wheatley Davis, local Manager of St. Louis Terminal, called John Whitsitt of the defendant Bank and informed him that he had just returned from Mobile where an audit had been conducted of the St. Louis Terminal warehouse receipts and that everything checked out satisfactorily. He further stated

822

that while in Mobile, he had learned that the Alabama Grain Elevator Company had under lease and in its own facilities storage capacity for handling 2,500,000 bushels of beans.

Mr. Davis seemed to be satisfied with the condition he found in Mobile in respect to the number of receipts outstanding compared to the capacity of the elevator.

This conversation was re-affirmed by Mr. Davis on May 16, 1955, at a luncheon in the Bank at which Troy Beatty, Jr., W. A. Wooten and John Whitsitt, officers of the Bank, were present.

28. On February 19, 1955, Butler, in response to an invitation which had been extended to him a day or so earlier, came into the Bank for lunch with Allen Morgan, Executive Vice-President of the Bank, John Whitsitt and Steve Doyle, the latter two then being Assistant Vice-Presidents in the Cotton Department. At this luncheon, Butler and the Bank officers discussed generally the soybean market and Butler indicated that he was very bullish and believed that beans might advance very substantially during the spring months. He indicated that he had a large concentration of beans at the Mobile port because he believed that should there be an outbreak of hostilities over Formosa, the price of beans would increase. He stated, however, that in any event he would dispose of the beans during the next sixty days in order to make way for the new wheat crop which would then be coming to market.

Butler discussed generally the nature of his Mobile operation and informed the Bank officers that the Elevator was issuing receipts against grain stored in barges, rail cars, and on other property leased from the Alabama State Docks. He indicated that the total storage capacity available to the Elevator was approximately 2,500,000 bushels. He stated specifically that he had space for approximately 700,000 bushels leased from the State Docks and that he had approximately 500,000 bushels of beans in railroad cars and barges and that it was

permissible under the Alabama State law for an Elevator to issue its receipts against grain on cars and barges when the grain had arrived and the Elevator had possession of the bills of lading. He also stated that he had some space available to him in the Rhimer's Warehouse at Foley, Alabama. He further indicated that his long range plans were to work with the State of Alabama toward leasing a 2,500,000 bushel additional storage plant which the State contemplated building adjoining the Alabama Grain Elevator.

29. At the lunch, Butler stated that Wheatley Davis, local Manager of St. Louis Terminal Company, had called him in Chicago and informed him that the Bank had been checking on the storage capacity of the Elevator. Butler stated that he had agreed to meet Davis in Mobile as he didn't want anyone to have any doubt about the collateral pledged, and he himself wanted to be satisfied that everyone was 100 per cent protected. Butler, however, expressed his displeasure with the fact that the Bank had not called him first on the matter instead of turning to St. Louis Terminal.

30. At the luncheon meeting, Butler stated that he had refused St. Louis Terminal permission to check his books and records because of the time it would consume and because of the further fact that he did not feel that they were entitled to that much information about his business. However, he told the Bank that he would welcome an inspection by the Bank at any time, and he, in fact, urged some of the Bank officers to visit the Elevator.

31. After the lunch, Butler and the Bank officers who had lunch with him moved to the conference room, where Butler was asked for figures on his overall debt position and the collateral securing the same. He confirmed the debt, which the Bank had already determined by checking with the two banks in Mobile and with the Bank of Manhattan in New York.

32. It was the belief of all of the Bank officers at the luncheon that the

Alabama Grain Elevator Company had in its control and possession more than enough beans to cover all outstanding receipts, that what had at first appeared to be a discrepancy between the capacity of the Elevator and the number of receipts outstanding had been satisfactorily explained by the practice of issuing receipts against commodities in the control of the Elevator although outside of the Elevator itself, and that the collateral for the loan was sound and not affected by the location of the beans.

33. At that time, the Bank officers had no information of any kind whatsoever indicating that Butler or any of his companies were in any kind of financial trouble or difficulty. The Bank officers felt that Butler, individually, was still an extremely wealthy man and that his guaranty of the Milling Company's indebtedness was good for $3,000,000.

It was thought that the Milling Company itself had an ample equity in the beans pledged to the Bank in that the market price of same was substantially in excess of the amount advanced against them.

The Bank's officers did not request payment of the Milling Company's indebtedness to it but, on the other hand, they were satisfied to continue with the loan without change.

34. William A. Wooten, head of the Cotton Department, and Allen Morgan, were fully advised as to the events of the week of February 14, 1955, and they, in turn, communicated in substance this information to Norfleet Turner, President of the Bank. These officers, as well as the other officers of the Cotton Department, were of the opinion that the apparent discrepancy between capacity and receipts outstanding had been satisfactorily explained, that there was no reason to be concerned further about the collateral on the debt, and that there was nothing in the C.E.A. charges which would justify making any change in the Bank's credit policy in relation to Butler or any of his companies.

35. In view of the fact that the Department of Agriculture charges against Butler had been widely publicized in the local press, Allen Morgan, who was the officer primarily responsible for the Milling Company loan, as well as other loans which the Bank was making to Butler and his companies, with the approval of Norfleet Turner, decided to re-submit the line of credit to the Discount Committee of the Board of Directors of the Bank with the recommendation that the line be continued. The matter was presented to the Discount Committee on February 23, 1955, and it unanimously voted to continue the line.

36. The Bank officers contemplated that the Milling Company, after selling the soybeans then pledged to the Bank, would be borrowing against other receipts of the Alabama Grain Elevator Company. Therefore, as a matter of general information, inquiries were made of others, during the week of February 21, 1955, as to the general acceptability in the trade and banking channels of warehouse receipts issued by warehouses licensed under the laws of Alabama. One of the defendant Bank officers wrote to one of the Mobile banks to obtain a copy of the Alabama laws relating to warehouses so that the Bank could be better informed on this subject.

37. Following the re-affirmance of the line of credit by the Discount Committee on February 23, 1955, the Bank officers, except for the inquiries previously referred to, were satisfied with the status of the Milling Company loan. Sometime during the week of February 21, 1955, Allen Morgan, who had several months prior thereto planned a Florida trip with his wife for the early part of March, thought it would be a good idea from a customer relations standpoint to accept Butler's invitation to visit the Mobile Elevator. He thereupon called Butler and advised him that he would, on his return from Florida, stop in Mobile about the 10th of March and visit the Elevator.

38. On February 28, 1955, Butler phoned Harold Vogel, a Vice-President of Continental Grain Company in charge of its St. Louis office, and offered to sell him 1,400,000 bushels of soybeans which he stated were stored at the Alabama Grain Elevator at Mobile, which elevator was known by Vogel to be controlled by Butler.

39. Harold Vogel discussed with Julius Mayer, Executive Vice-President of Continental in charge of the mid-west territory, and Gustav Eisemann, an Executive Vice-President of Continental in the New York office, who, in turn, consulted with Michel Fribourg, President of plaintiff company, concerning the advisability of Continental's increasing its soybean inventory and the price which should be paid for the beans. After further discussions with Butler, on February 28, 1955, Continental and the Milling Company reached an oral agreement in which the Milling Company agreed to sell and Continental agreed to buy 1,400,-000 bushels of soybeans F.O.B. vessel, Mobile, Alabama, at a price of eight cents over Chicago May futures. May futures on February 28, 1955, were $2.62½ per bushel, but the price was to be finally fixed by the parties according to the future price on a determined later date. The price of eight cents over Chicago May futures was materially less than the market price, which, on February 28, 1955, was from eighteen to nineteen cents over Chicago May futures.

40. It was a part of the agreement that Continental would advance to the Milling Company in Memphis the following day, March 1, 1955, ninety per cent of the estimated purchase price of beans, as indicated by the current price of Chicago May futures. This sum was to be advanced against the delivery to Continental of receipts of the Alabama Grain Elevator Company for a specified quantity of beans. The contract further provided that as the price of Chicago May futures advanced or declined, either party would have the right to call upon the other for additional money in order that the ninety per cent advance would be maintained at the percentage of the estimated price as keyed to the current price of Chicago May futures.

41. Later, on February 28, 1955, after the oral trade had been made, Butler phoned Harold Vogel and told him he could not go through with the trade, as he did not have beans of the grade called for in the contract, and that he wanted to cancel. Vogel discussed Butler's request for cancellation with Julius Mayer and Gustav Eisemann and informed Butler that he could not cancel unless he was willing to buy the beans back from Continental at a price satisfactory to Continental.

42. The following day, March 1, 1955, Continental had $3,300,000.00 transferred from a Chicago bank to its account in the defendant Bank, and instructions were given by the St. Louis office of Continental to Jack Gordon, its Memphis Manager, to pick up from Butler a signed confirmation of the trade and, after getting the warehouse receipts from the Milling Company, to pay it the amount called for by the confirmation. Before this could be done, Charles M. Crump, a Memphis attorney, who regularly represented Continental in Memphis on a monthly retainer basis, and who also represented Butler, learned that Butler had entered into the foregoing trade with Continental and, knowing that the receipts of the Alabama Grain Elevator Company, which Butler proposed to deliver to Continental, were not supported by beans, called Harold Vogel in St. Louis and urged him not to go through with the trade. Crump refused to give Vogel any reason for his urging him not to go through with the trade. He repeated three or four times this advice to Continental not to go through with the trade, stating each time that he was talking to Vogel as Continental's attorney and not upon behalf of Butler. Crump stated further that the matter was so serious that if Continental did not take his advice he would have to withdraw as Continental's Memphis attorney. This he, in fact,

did after Continental disregarded his advice.

After the receipt of this phone call, Jack Gordon, Memphis Manager of Continental, was asked to stand by and not go through with the trade until he received further instructions. The information from Crump's call was then relayed by Vogel to Eisemann and Mayer.

43. Later that day, before the trade was closed, Crump again called Vogel and urged him not to go through with the trade and suggested that Vogel and Butler talk in an effort to agree upon a satisfactory payment by Butler to Continental for cancellation of the contract. When Vogel and Butler were unable to agree upon a cancellation price, Vogel, after suggesting to Butler that it would become known in the trade if he did not complete the contract, directed Jack Gordon, Memphis Manager, to go to Butler's office and complete the transaction.

44. In the preliminary talks concerning this trade Butler told Vogel that the warehouse receipts which would be delivered to Continental were then pledged to the defendant Bank to secure an indebtedness of the Milling Company to the Bank.

45. On the afternoon of March 1, 1955, W. E. Marchman, a duly authorized representative and Secretary of the Milling Company, went to the defendant Bank and withdrew on trust receipt warehouse receipts of the Alabama Grain Elevator Company covering 1,367,739 bushels of soybeans, which receipts were held by the Bank as pledgee to secure an indebtedness of the Milling Company in the amount of $2,699,491.

46. When Jack Gordon, the Memphis Manager of Continental, reached the offices of the Milling Company, the receipts had already arrived from the Bank. After examining the receipts tendered by Butler and reducing the amount of beans covered by the original confirmation from 1,400,000 bushels to 1,299,839 bushels, the confirmation was signed by Butler, an invoice was prepared covering the receipts, and the receipts, after Butler had endorsed them on behalf of the Alabama Grain Elevator Company for the purpose of showing agreement for thirty days free storage, were delivered to and accepted by Gordon for Continental. Gordon thereupon delivered to Butler for the Milling Company a check drawn on the defendant Bank payable to the order of the Butler-Foster Milling Company in the amount of $3,164,458.05. Gordon then mailed the receipts and a copy of the confirmation to his St. Louis office, which in turn forwarded the receipts to the Chicago office of Continental. The receipts were then delivered by the plaintiff to the Continental Illinois National Bank of Chicago, Illinois, as collateral for loans by that bank to the plaintiff.

47. Later that day, during normal business hours of the Cotton Department of the defendant Bank, a representative of the Milling Company went to the Bank and deposited in the account of the Milling Company the aforesaid check of Continental Grain Company. The Milling Company representative, as part of the same transaction, delivered to the Bank, in full settlement and satisfaction of the Milling Company's indebtedness to the Bank, a check drawn by the Milling Company on its account payable to the order of the Bank in the amount of $2,699,491.

48. As interest had been prepaid on all of the notes evidencing the aforesaid indebtedness to dates beyond March 1, 1955, the Bank, in keeping with its usual manner of handling such matters, computed the amount of unearned interest, which sum was $4,023.54, and credited the Milling Company's account with this amount, thus reducing the net amount received by the Bank to $2,695,467.46. At the time the payment was made, the Bank marked all of the notes evidencing the indebtedness paid, cancelled the trust receipt, and delivered said notes to the Milling Company representative.

49. On the same day the bank account of the Milling Company, in addition to the deposit of $4,023.54 unearned interest, and the $3,164,458.05 resulting

from the deposit of the check of Continental, also contained $27,752.37, no part of which was derived from the plaintiff. Thus, only $2,667,715.09 of the money which the Milling Company had obtained from Continental was paid to the Bank in satisfaction of the Milling Company's indebtedness.

50. Still later on the afternoon of March 1, 1955, Butler sent a representative to the defendant Bank to obtain his Three Million Dollar unconditional written guaranty of the Milling Company's indebtedness, and this guaranty was surrendered.

51. At the time the Bank received payment of the aforesaid indebtedness, it did not know of any of the details relating to the trade between Continental Grain and the Milling Company. It did not know exactly what the Milling Company had sold Continental, or the price or the terms of the trade, although it had learned earlier that morning that Continental was contemplating buying beans from Butler and it knew that the Milling Company had picked up the receipts from the Bank at about the time it learned that Jack Gordon was going to the office of the Milling Company for the purpose of making some kind of trade with Butler relating to soybeans.

52. Payment of the Milling Company's debt to the Bank on March 1, 1955, was regarded by Bank officers as a normal routine payment, and no particular significance was attached to it. None of the Bank officers familiar with the transaction knew, believed or suspected that the Milling Company had obtained the money by fraud, or any other improper means.

53. Allen Morgan, pursuant to previous plans, (Finding # 37) left Memphis on March 1, 1955, and after a vacation trip to Florida, stopped at Mobile, Alabama, on March 10, 1955, even though the Milling Company indebtedness to the Bank had been paid off on March 1, 1955, prior to the time that Morgan left Memphis. In addition to calling on other Bank customers of the defendant in Mobile, Morgan visited the Elevator site and also the general offices of the Elevator Company in one of the downtown office buildings.

54. At the meeting in Mobile on March 10, 1955, Robert Bacon, of The First National Bank of that City, indicated that he was fearful that his bank would lose Butler's business if it alone of all banks lending to Butler continued to require field warehouse receipts even though, unlike other banks, it was lending directly to the Elevator Company. He discussed with Morgan the possibility of his Bank in Memphis also requiring field warehouse receipts.

55. After Morgan learned on March 10, 1955, from officers of the Alabama Grain Company that the State had never inspected the Elevator, he agreed with Bacon that he would recommend that Butler in the future establish a field warehouse arrangement for the entire elevator. In order to induce Butler to accept such a proposition, he and Bacon agreed to reduce the interest rate to Butler and his various companies, and it was agreed that upon Morgan's return to Memphis he would discuss the matter with Butler.

56. The line of credit of the defendant Bank to the Milling Company remained open for approximately two weeks after March 1, 1955, and the Milling Company upon return of Butler's guaranty and presentation of warehouse receipts as required by the line of credit could have borrowed up to $3,000,000 from the Bank during this period of time.

57. It was not until a few days before the filing of an attachment suit by Continental against Butler on March 19, 1955, that the defendant Bank officers received any information indicating that Butler or his companies were in any kind of difficulty. This information came in the week of March 14, 1955, through rumors and through inquiries which others made of the defendant Bank for information relating to Butler's financial strength. These suggested that Butler might be in financial trouble.

Upon receipt of these rumors and inquiries, Morgan called Butler and advised him concerning same and Butler responded that he had taken some heavy losses and had some future commitments to be paid off, but that he was prepared to take care of them.

58. The first positive information the defendant Bank had that Butler was in trouble came on March 18, 1955, when Robert Bacon of the First National Bank of Mobile advised that he had learned that the auditors of the State of Alabama had checked the Grain Elevator at Mobile and found there was a shortage of soybeans.

59. On the morning of March 19, 1955, plaintiff Continental Grain Company, filed an attachment suit against Butler and his various companies in the Chancery Court of Shelby County, Tennessee, charging that the warehouse receipts which the Milling Company had sold to it were not supported by beans, that Butler and his companies were insolvent and were fraudulently disposing of their assets.

60. It was not until this suit was filed that Norfleet Turner, President of the Bank, learned that the Milling Company's indebtedness to the Bank had been paid.

61. In the meantime, the plaintiff Continental, on March 10, 1955, as a result of learning that Butler had sold approximately one-half million bushels of beans to Leval and Company of New York, called Butler and obtained from him an admission that the receipts were not supported by beans.

62. Conferences were held in Memphis on March 11 and 12, 1955, between Butler and his attorneys and various officers of Continental and its attorneys. During these conferences Continental was informed that there were only about 60,000 to 100,000 bushels of beans in the Elevator at Mobile, and disclosures were made to Continental by Butler and his attorneys of Butler's overall situation, both as to physical assets and his positions on the various futures markets.

Also, Continental was given complete access to all of the books and records of Butler and his various companies, both in Memphis and in Mobile.

63. On March 12, 1955, Continental sent one of its officers who was a Certified Public Accountant to the Memphis office of Butler and his companies where he remained for more than a week investigating their books and records and making photostats of all records which he considered important.

64. On March 14, 1955, three officers of plaintiff Continental thoroughly checked the Alabama Grain Elevator, including its books and records, and established to the satisfaction of Continental that the receipts were not supported by more than approximately 68,000 bushels of beans, which were of low grade.

65. Meetings were held in the New York offices of Continental on March 14, 1955, at which time Continental recognized the fact that it had been defrauded. At that time Continental related the facts of the shortage to Leval and Company which, on March 2, 1955, had bought a half a million bushels of beans from Butler for which it accepted a warehouse receipt of the Elevator Company upon payment of approximately $1,300,000.

66. At these meetings in New York Continental decided to withdraw as collateral from the Continental Illinois National Bank the warehouse receipts of the Alabama Grain Elevator Company which it had pledged to that Bank to secure its borrowings; to notify some of its principal banks that it was facing a loss; and to see if it could obtain a lease on the Grain Elevator at Mobile.

Except for notifying Leval and a few of Continental's principal banks, the existence of the facts which Continental had discovered were not made public until March 19, 1955, and the defendant Bank did not learn that anything was wrong with Continental's trade with the Milling Company prior to that time. In fact, the Bank had continued to do business with Butler and his various companies in a normal routine manner up until that time.

67. On March 15, 1955, pursuant to the margin adjustment provisions of the contract between Continental and the Milling Company, expressed in the confirmation of March 1, 1955, Continental called upon and received from the Milling Company a margin payment of $29,250. It was this margin payment by the Milling Company to Continental that resulted in one of the bookkeepers in Continental's Memphis office calling a clerk at the defendant Bank on March 15, 1955, and inquiring as to whether this check deposited in Continental's account in the defendant Bank and drawn by the Milling Company on another bank was good.

68. On the following day, March 16, 1955, Jack Gordon, the Memphis Manager of Continental, came to the Bank and requested a Bank officer to give him the numbers of the warehouse receipts which it had held as collateral for the Milling Company loan. Inasmuch as Continental was asking information concerning one of the Bank's customers, and inasmuch as the phone call had been made the previous day regarding the check, the Bank officer, before undertaking to supply any information to Continental, inquired if there was anything wrong with the transaction between Continental and the Milling Company or if there was any kind of controversy between the two of them. Jack Gordon stated that there was nothing wrong with the transaction. Thereupon this Bank officer showed Gordon the collateral records relating to the Milling Company account, but these records did not reveal the numbers of the warehouse receipts held by the Bank. Gordon admitted that the request for the receipt numbers was a ruse and that he really wanted to determine if the receipts were actually withdrawn from the Bank on March 1, 1955.

69. During that same day, the Bank inquired further of Gordon as to the reason for the phone call of the previous day and was again assured that Continental had no information whatsoever suggesting that the Milling Company was in any trouble or difficulty and that Continental's bookkeeper had no authority for making the call.

70. On March 31, 1955, after the basic facts relating to the fraud were known and after the Chancery suit against Butler and his companies had been filed Continental appeared at a hearing before the Commissioner of Agriculture of Alabama, at Mobile, and asserted its ownership of the warehouse receipts.

71. After Continental learned of the fraud of the Milling Company, and although it knew on March 1, 1955, that the Milling Company had paid its indebtedness to the defendant Bank in part with money obtained from Continental, it made no claim or demand upon the Bank until this suit at bar was filed on March 16, 1956, which was one year after its Memphis Manager had assured the Bank that there was nothing wrong with the March 1, 1955, trade between Continental and the Milling Company.

72. Between the time when the Milling Company's debt was paid to the defendant Bank on March 1, 1955, and the filing of this suit, many events, a number of them initiated by Continental, have occurred which have materially changed the position in which the Bank would have been, had the debt not been paid.

(a) The Memphis assets of Butler and all of his Missouri companies were impounded by the attachment suit in the Chancery Court of Shelby County, Tennessee, on March 19, 1955.

(b) On March 21, 1955, Continental, along with Leval & Company of New York, filed an involuntary petition in bankruptcy against the Milling Company. This petition was pressed to final adjudication in late April, 1955.

Within a few weeks thereafter, Butler, individually, and his other Missouri corporations filed voluntary petitions in bankruptcy and were adjudicated bankrupts.

(c) Shortly thereafter, the Alabama Grain Elevator Company was adjudicated a bankrupt on an involuntary peti-

tion filed by the Trustee in Bankruptcy for the Butler-Foster Milling Company and others.

(d) Most of the physical assets of these companies have been disposed of by the Trustees in Bankruptcy and the leasehold upon which the Alabama Grain Elevator was erected has reverted to the State of Alabama.

(e) The time for filing claims against all of these bankrupts had expired without the defendant Bank having filed any claim and without any claim having been asserted by the plaintiff against the Bank.

(f) On February 1, 1956, Continental and Leval filed suit in Birmingham, Alabama, against the Federal Insurance Company on the warehouseman's bond covering the Alabama Grain Elevator. Subsequent to the filing of this suit herein the suit above was pressed to final judgment, which fully discharged all liability of the bonding company on the warehouseman's bond and Continental, as a result of that judgment collected in excess of $140,000, which it still retains.

73. In view of the foregoing events subsequent to the discovery by Continental of the fraud which had been committed against it, the defendant Bank's position was so materially changed that it cannot now be restored to the status in which it would have been had the Milling Company's indebtedness not been paid. These changes include the following:

(a) In the belief that the Milling Company debt had been fully paid, the Bank released surplus collateral on other loans; permitted approximately $900,000.00 to pass through the accounts of Alabama Grain Elevator Company, Butler-Foster Milling Company, and Butler, individually; it lost its lien on these accounts and funds; and lost the right to deal with Butler and his various companies as going concerns.

(b) It lost the right to participate in the various bankruptcy proceedings.

(c) It lost the right to file claims against the bankrupt estates.

74. The Bank in receiving the payment on March 1, 1955, from the Milling Company acted in good faith, without knowledge or notice that the Milling Company had obtained the money by fraud or any other improper means.

75. When the C. E. A. charges were filed against Butler and when a question arose as to a discrepancy between the total number of warehouse receipts outstanding and the capacity of the Elevator, the defendant Bank made a reasonable investigation of those matters.

(a) It inquired first of responsible third parties in a position to have knowledge about said matters and whose reports the Bank had no reason to doubt or question. It thereafter discussed the matter with Butler and the information which he gave was consistent with and was confirmed by the reports of these third parties.

(b) The information thus received by the Bank gave it a reasonable basis for believing that the receipts were supported by beans, and that the Elevator Company would deliver beans of the quality and kind called for whenever the receipts were presented.

76. The defendant Bank was familiar with the provisions of Sec. 5200 of the Revised Statutes, Title 12 U.S.C.A. § 84 (6) and with Sec. 1561(a) of the Regulations of the Comptroller of the Currency pursuant thereto. The Bank did not regard this regulation as being applicable to this loan because the Bank was lending to the Milling Company which owned no stock in the Elevator Company, a separate corporation, operating under a Board of Directors consisting of able businessmen, and which was subject to the control, supervision and inspection by the officials of the State of Alabama.

The defendant Bank, as well as the plaintiff, considered that the warehouse receipts of the Elevator Company were valid, negotiable documents which moved

freely in the channels of commerce and were acceptable to the grain trade and others.

77. The receipts were signed by J. J. Wilson and E. S. Morgan, the former being designated by the Elevator Company as the person authorized to sign receipts upon its behalf, and the latter being the general manager of the elevator.

78. As of March 1, 1955, Butler and all others connected with the Mobile Elevator were men of outstanding reputations for the qualities of honesty, integrity and business ability. The defendant Bank exercised reasonable diligence in accepting the warehouse receipts herein and in the management of the collateral account of the Milling Company.

79. It was reasonable for the defendant Bank to assume that the Board of Directors of the Mobile Elevator Company, composed, as it was, of experienced, competent business and professional men, would not have permitted the Elevator to have been operated in violation of law and for the Bank to have assumed that the public officials of the State of Alabama, with the duty of supervision and inspection, were performing their duty to prevent unauthorized acts and practices.

The situation which in fact existed at the Elevator could not occur without a complete abandonment by the Board of Directors of the duty imposed upon it by law, and a complete breakdown of the inspection system provided by the Warehouse Laws of Alabama and the commission of crimes of large proportions in which a number of people had to participate. In view of the outstanding reputations of those connected with the Elevator, there is no basis for a finding that defendant Bank should have anticipated the events which did in fact occur.

80. Continental is one of the nation's largest warehouser's of grain, having many skilled warehousemen in its employ. It, at all times, was aware of the capacity of the Grain Elevator at Mobile.

It had in Mobile a forwarding agent who, at least weekly, sent to Continental's St. Louis office reports advising it as to what was stored in the Elevator and indicating the quantity of commodities scheduled to be loaded out of the Elevator for shipment. These reports passed over the desk of Harold Vogel as they reached the St. Louis office and thereafter passed over the desks of his two top assistants and to others in the office.

These reports should have revealed to Continental that the receipts which it purchased from the Milling Company could not have been valid unless the Elevator had storage facilities available to it in excess of 1,600,000 bushels. The relationships between the St. Louis office of the plaintiff and its forwarding agent were such that a phone call to such agent would have revealed that the receipts which Continental obtained were not supported by beans in the Elevator proper.

### Conclusions of Law

#### I.

The Court has jurisdiction of the parties and of the subject matter herein.

#### II.

■ Plaintiff Continental was defrauded by the Milling Company, acting through Butler, in the transaction of February 28–March 1, 1955. Continental entered into the transaction in good faith, thinking it was purchasing the 1,-299,839 bushels of soybeans as well as the twenty-six negotiable warehouse receipts. However, because of the fraud on the part of Butler and the Milling Company, and because Alabama Grain did not have beans to support the receipts, Continental actually purchased only the twenty-six receipts.

#### III.

Because of the fraud, the February 28–March 1, 1955, transaction was voidable and not void. As a result, Continental took good title to the warehouse receipts on March 1, 1955, but such was voidable at the option of Continental, the defraud-

ed party. Williams v. Spinks, 1928, 7 Tenn.App. 488, certiorari denied.

## IV.

▮ Upon its discovery of the fraud on March 10, 1955, Continental had the right in equity to disaffirm the fraudulent transaction by recision, and to trace the funds paid by it to the Milling Company into the hands of any party taking any part of the funds with knowledge of the fraud. Likewise, at that time, Continental also had at its election the right to affirm the transaction and proceed at law to recover damages for the fraud perpetrated upon it.

A disaffirmance of a fraudulent transaction by recision, and the tracing of assets thereunder, is inconsistent with a suit at law in affirmance of the transaction for the recovery of damages occasioned by the fraud, and relief cannot be had under both. Upon learning of the fraud, Continental could pursue either course of action but, because the courses of action are inconsistent, it could not pursue both, and was required to make its election. Durham v. New Amsterdam Cas. Co., 4 Cir., 1953, 208 F.2d 342.

## V.

▮ Where there is a voidable transaction with inconsistent courses of action open to the defrauded party at his option, he may by bringing a court action or by some other decisive act based upon one such course of action, indicate his election between the courses of action; and where he does so with knowledge of the facts and without fraud or imposition on the part of the other party, he is conclusively bound by his election, and he cannot thereafter obtain relief under the other and inconsistent course of action.

Continental has, both by bringing actions and by other acts in affirmance of the transaction, with full knowledge of the facts and without fraud or imposition on the part of defendants, elected to affirm the transaction. Having thereby exercised its option and having fixed the substantive and property rights involved herein, Continental is conclusively bound by its election, and may not now obtain benefits by a disaffirmance of the transaction. United States v. Oregon Lumber Co., 260 U.S. 290, 43 S.Ct. 100, 67 L.Ed. 261; White v. Henry, 1955, 199 Tenn. 219, 285 S.W.2d 353.

## VI.

▮▮ The first act in affirmance of the transaction was the acceptance of the $29,250 from the Milling Company, for margin pursuant to the futures contract, after Continental had learned of the fraud. Likewise, the statements under oath of the hearing concerning the revocation of the license of Alabama Grain, that Continental had purchased and was the holder of the receipts, after it had learned of the fraud, was a recognition of the contract as a subsisting one. Mayfield v. First National Bank of Chattanooga, 6 Cir., 1943, 137 F.2d 1013; First National Bank in Wichita v. Luther, 10 Cir., 1954, 217 F.2d 262.

## VII.

▮ The second act indicating an affirmance was the filing and prosecution by Continental of the Shelby County Chancery Court attachment suit. This attachment suit was based on the premise that the Milling Company was fraudulently disposing of its property; and it proceeded against the entire estates of the defendants therein in a summary manner, rather than attempting to rescind the transaction and to trace only the particular assets involved. Bagwell v. Susman, 6 Cir., 1947, 165 F.2d 412, 415.

## VIII.

The third act of affirmance of the transaction was the filing and prosecution of the involuntary bankruptcy proceedings against the Milling Company, and the presentation of its claim as a general creditor against the bankrupt estate for the total amount involved, namely, $3,135,208.05. Agents of Continental made oath that certain facts were true, particularly that Continental was a general creditor and that the payment

of the $2,699,491 to the defendant Bank was a preferential transfer, and the present suit seeks relief which could be granted only if those facts were not true. To this date Continental is relying upon that claim against the bankrupt estate and that position as a general creditor is inconsistent with its position in the instant suit. Standard Varnish Works v. Haydock, 6 Cir., 1906, 143 F. 318; First National Bank in Wichita v. Luther, 10 Cir., 1954, 217 F.2d 262.

## IX.

The fourth and most decisive act of affirmance was the filing, prosecution to judgment of the Birmingham, Alabama suit against Alabama Grain's bondsman, and the subsequent collection of that judgment. That suit was based upon the theory that Continental purchased and was the owner and holder of the warehouse receipts; that Alabama Grain did not have on hand the beans supposedly represented by the receipts; and that, therefore, as the owner and holder of the receipts Continental had a right of action against the bondsman under the terms of the statutory bond. Title 2, Art. 34, Secs. 511, 525, 545, 549, and Art. 35, Secs. 573, 574, Code of Alabama, 1940.

These acts in the Birmingham suit, taken deliberately and with full knowledge of the facts, clearly constituted the exercise by Continental of its option to affirm the transaction herein; those acts conclusively established Continental's status as the purchaser and owner of the receipts; and those acts conclusively established the substantive rights of all parties involved as to their property rights in regard to the receipts. United States v. Oregon Lumber Co., 1922, 260 U.S. 290, 43 S.Ct. 100, 67 L.Ed. 261; Mayfield v. First National Bank of Chattanooga, 6 Cir., 1943, 137 F.2d 1013; Barnes v. Walker, 1950, 191 Tenn. 364, 234 S.W.2d 648; Tidwell v. Chattanooga Boiler & Tank Co., 1931, 163 Tenn. 420, 43 S.W.2d 221, rehearing denied 163 Tenn. 648, 45 S.W.2d 528.

## X.

■ It it immaterial that the judgment in the Birmingham suit was taken by Continental after the filing of the instant suit for recision. A party, after having filed a suit for recision, may by his subsequent actions inconsistent with his prayer for recision, thereby affirm the voidable transaction and bar himself from his pending claim for recision. Friedericksen v. Renard, 1918, 247 U.S. 207, 38 S.Ct. 450, 62 L.Ed. 1075; Phillips v. Rooker, 1915, 134 Tenn. 457, 184 S.W. 12.

## XI.

It is immaterial that Continental attempted to reserve unto itself the right to rescind the transaction herein and to trace the assets. Where knowledge of the facts exists, a reservation of the right to follow a different and inconsistent course of action at a subsequent time is of no avail. The reservation of rights clauses inserted by Continental in the attachment suit, in the bankruptcy proceedings and in the Birmingham suit are not binding on the parties to the instant suit. Minneapolis National Bank v. Liberty National Bank, 10 Cir., 1934, 72 F.2d 434; The Belize, D.C.S.D.N.Y.1938, 25 F.Supp. 663.

## XII.

■■ The fifth act of affirmance was the complete dominion exercised by Continental over the warehouse receipts which it had purchased from the Milling Company. Continually, from its discovery of the fraud to the present time, Continental used its possession of and title to the receipts to control the litigation growing out of the Butler frauds, and by its unequivocal actions has treated the receipts as its own property. Where a buyer, after discovery of the fraud, treats the property as his own, he waives whatever right of recision he might otherwise have had. Friedericksen v. Renard, 1918, 247 U.S. 207, 38 S.Ct. 450, 62 L.Ed. 1075; Pearson v. Washington College, 1914, 130 Tenn. 601, 172 S.W. 314.

## XIII.

In order to rescind, a buyer is required to return the property to the seller, even if it has no market or intrinsic value, if its possession or control is a benefit, or its loss a detriment, to the seller. The buyer must return the property to the seller in substantially the same condition as when he received it.

Possession and control of the warehouse receipts was a benefit to Continental, and their loss a detriment to the defendants herein. The receipts, although not backed by beans, had a definite and tangible value to a pro rata claim against the surety on the warehouse bond, which was demonstrated by the judgment and collection of same in the Birmingham suit. Thus Continental is unable to return the receipts in substantially the same condition. Friedericksen v. Renard, supra.

## XIV.

The sixth act of affirmance by Continental was its unreasonable delay in giving any notice of an intention to rescind. A defrauded party must act promptly and in an unequivocal manner to rescind a voidable transaction when he learns of facts constituting fraud. Having waited over a year from the time it learned of the fraud until it filed this suit for recision during which time intervening rights and equities arose. Continental affirmed the transaction and may not now rescind.

A defrauded party cannot defer a decision as to affirmance or recision in order to speculate on future events. Once having elected his rights and remedies, he must adhere thereto.

Having affirmed this otherwise voidable transaction, Continental is conclusively barred from any relief based on disaffirmance or recision. The constructive trusts sought by Continental herein are predicated on a recision of the transaction, Black v. Boyd, 6 Cir., 1957, 248 F.2d 156, at page 162, and since there can be no recision there can be no constructive trusts as against either the Trustee in Bankruptcy for the Milling Company or the defendant Bank. Williams v. Spinks, supra; Twin-Lick Oil Co. v. Marbury, 1875, 91 U.S. 587, 23 L. Ed. 328; Bagwell v. Susman, 6 Cir., 1947, 165 F.2d 412; Leake v. Grey, Shillinglaw & Co., 1949, 189 Tenn. 574, 226 S.W.2d 298, 303.

## XV.

Although Continental's affirmance of the transaction herein renders immaterial any question concerning the knowledge and good faith of the defendant Bank the proof in this record is not so clear, convincing, unequivocal and cogent as to satisfy the Court that a constructive trust should be raised against it. Hoffner v. Hoffner, 32 Tenn.App. 98, 221 S.W.2d 907, certiorari denied.

## XVI.

The defendant Bank received the money in question in good faith without notice and cannot be held to be a constructive trustee in favor of the plaintiff Continental. United States v. Dunn, 1925, 268 U.S. 121, 132, 133, 45 S.Ct. 451, 69 L.Ed. 876; Chadwell v. Wheless, 74 Tenn. 312.

## XVII.

The Trustee's cross-claim against defendant Bank is an action at law, whereas the instant suit is one in equity. Since the Trustee in the trial of this case did not introduce evidence concerning any alleged preferential payment to the Bank, the subject of the cross-claim, the results herein in no way affect the Trustee's action against the defendant Bank.

## XVIII.

The suit of the plaintiff, Continental Grain Company, against both defendants is hereby dismissed at the plaintiff's costs.